## Mercado v. Fuentes-Carrion

*Joseph A. Guillama,* for plaintiff.
*Osvaldo Espinosa,* for defendant.

LASH, *J.,* February 4, 2009—This court held a child custody trial on December 18, 2008 and January 27, 2009. At issue is primary custody of the parties' minor child, Jannellys Fuentes, born July 14, 2003. We enter the following findings of fact:

## I. FINDINGS OF FACT

(1) Plaintiff, Jannette Mercado (Mother), is an adult individual who currently resides at 434 Spruce Street, Reading, Berks County, Pennsylvania 19602.

(2) Defendant, Luis Fuentes-Carrion (Father), is an adult individual who currently resides at 2651 Northfield Drive, East Petersburg, Lancaster County, Pennsylvania 17520.

(3) Father and Mother are the natural parents of Jannellys Fuentes, born July 14, 2003 (minor child). The parties are also the natural parents of a minor child, Josiah, born June 13, 2002, who is not a subject of this action.

(4) Mother resides in the Reading School District, and Father resides in the Hempfield School District in Lancaster County.

(5) The parties were never married. The parties resided together from 2001 until late 2002.

(6) From birth until February 2, 2007, the minor child resided with Mother. In February 2007, Berks County Children and Youth Services (CYS) recommended transfer of custody of the minor child to Father in order to protect the minor child from her brother, Josiah, who suffers from autism, and who would periodically assault the minor child. CYS also considered as a factor the condition of Mother's home, which featured leaks in the roof and was without heat.

(7) From February 2007 to the present, the minor child has resided with Father.

(8) The minor child attends the East Petersburg Elementary School in Lancaster County and is enrolled in Kindergarten. She also receives daycare services at Penny Bauer's Family Daycare, located at 2330 Leabrook Road, East Petersburg, Pennsylvania 17520.

(9) Mother currently resides with her two other daughters, Chantel Negron, born December 5, 1999, and Bianette Santiago, born April 22, 2008. Josiah is currently in therapeutic foster care but does visit with Mother periodically.

(10) In addition to the minor child, Father resides with his paramour, Elisa Vollrath, and her daughter, who is attending college.

(11) Mother is currently unemployed.

(12) Father works for the Keystone Pretzel Bakery in Lititz, Lancaster County, Pennsylvania, as a mechanic for the past three years. He is employed Monday through Friday from 7 a.m. to 3 p.m.

(13) At the time the minor child first moved in with Father, she was diagnosed with pervasive development disorder NOS (the umbrella for autism). She was placed in a restrictive classroom through the IU-13 for Early Intervention. She was reevaluated in April 2007. At that time, it was determined that it was no longer necessary to place the minor child in a restrictive classroom. She was then placed in a less restrictive classroom until July 2007, also through the IU-13 in Lancaster. Upon completion of the school year, she began to receive language support in August 2007, one time per week at the daycare, through June 2008.

(14) The minor child also began mobile therapy in the fall of 2007 (12 hours per month) through Hugh S. Smith Ph.D. and Associates P.C. The therapy, which lasted until May 2008, helped her express her feelings and also addressed the expressive language disorder.

(15) In September 2007, CYS closed the case due to the fact that she remained in the custody of Father and her own behavior and mental health status had stabilized.

(16) On April 29, 2008, the East Petersburg Elementary School psychologist, Tom Shlegel, conducted a reevaluation of the minor child, identifying the minor child as a student with a disability under the category of speech or language impairment. The evaluation team recommended that the minor child receive speech/language support during her Kindergarten year. The team also agreed that her needs could be met within the regular educational environment, with academic support being provided as needed. The minor child has received speech therapy since the beginning of the current school year in a regular educational environment.

(17) Jennifer A. Fernandez Ph.D., a psychologist with Hugh S. Smith Ph.D. and Associates P.C., evaluated the minor child on October 8, 2008, and recommended that the minor child receive play therapy, as well as out-patient treatment, to address transition and adjustment issues that she may experience in the future. Dr. Fernandez also recommended that, given the minor child's history of emotional behavioral concerns, she should receive management services from the Lancaster County MH/MR office.

(18) Upon recommendation of Dr. Fernandez, the minor child is now receiving play therapy through Hugh S. Smith Ph.D. and Associates P.C., since October 2008, to help her identify emotions and deal with feelings, memories, etc., of her previous abuse.

(19) On or about August 10, 2007, Mother commenced the within action, seeking custody of the minor child. Concurrently, she requested an emergency hearing to obtain custody.

(20) On August 21, 2007, after an agreement was reached, this court issued an order providing that Father should retain primary physical custody, with Mother to have supervised partial custody every other weekend from Saturday at 10 a.m. to Sunday at 6 p.m., to take place in the home of the maternal grandmother, who was to be present at all times. Additionally, it was agreed that Mother would not be present during exchanges of the minor child.

(21) On or about September 17, 2007, Father obtained a protection of abuse order against Mother in the Court of Lancaster County for a term of one year. The order was entered by agreement, without admission.

(22) Father has an extensive criminal record with multiple convictions for violent and drug related offenses. Father has also spent significant amounts of time incarcerated.

(23) An independent psychological evaluation was performed by Ivan P. Torres Ed.D., of Alpha Counseling and Mediation Center Inc. Dr. Torres provided a written report dated July 7, 2008.

(24) Dr. Torres prepared his evaluation based on information received from interviews with the parties, the minor child, and her sister, Chantel, home studies conducted of the parties' residences, documentation received from Hugh S. Smith Ph.D., the Youth Advocate Program, CYS, Service Access Management, Child Family Services, as well as Father's criminal history, and observations of the minor child with the parties and other individuals, and also the individual education plan for Josiah from the Berks County Intermediate Unit.

(25) According to Dr. Torres, the minor child initially was identified as suffering from autistic spectrum disorder. More recently, however, the diagnosis has been changed to reactive attachment disorder, inhibited type. Other diagnostic impressions have included adjustment disorder with mixed disturbance of emotions and conduct. Additional axis I diagnosis include learning disorder not otherwise specified and mixed receptive expressive language disorder.

(26) Currently, the minor child is prescribed psychotropics, namely, Risperdal, 0.25 milligrams per day, and Nortriptyline, one teaspoon per day. She has been receiving some type of medication intervention since age 2. She also receives speech therapy and wraparound services from a behavioral specialist approximately three

hours per week, as well as 10 hours of therapeutic staff support per week.

(27) Based on Dr. Torres' home evaluations, both households appear to provide an appropriate physical environment for rearing the minor child.

## II. DISCUSSION

In making our determination, this court considered the testimony of the parties, Father's paramour, Elisa Vollrath, the minor child's Kindergarten teacher, Linda Marie Cray, her daycare operator, Penny Bauer, Janet Steigerwald from CYS, Lisa Bernard from the Youth Advocacy Program, the minor child's play therapist, Jacqueline Concepcion, the maternal grandmother, Nelida Pagan, the expert testimony of Dr. Ivan P. Torres, an in camera conference with the minor child's half-sister, Chantel, and the exhibits of the parties, including a custody home study prepared for Father's household by Pressley Ridge.

Mother is requesting that primary custody of the minor child be returned to her. She believes that CYS acted wrongfully in removing the minor child from her in the first place. She believes the injuries to the minor child were merely "scratches and bruises." She believes the minor child was never in serious danger from Josiah. In any event, Josiah is now in therapeutic foster care, and Mother has agreed that Josiah and the minor child will have no contact, at least until Josiah's issues can be properly addressed. Mother also remedied the physical problems with her home. Finally, she has taken parenting classes and otherwise submitted to CYS's requests.

Mother presents as an individual with a strong bond and passionate love for the minor child. The minor child's removal from the home was a heartbreaking experience for Mother. It also stung her pride, for the action called her capacity as a mother into question. Her commitment is apparent, as evidenced by her statement that she would move to Lancaster near Father's home, if necessary, in order to resume custody of her minor child. She is also very invested in Josiah's care, which reportedly can be formidable.

In some regards, however, she appears to be somewhat passive. It appears that the maternal grandmother, not Mother, is the head of the household and is the one who makes decisions, follows through to make sure things are done properly, and oversees the welfare of her family, including Mother and Mother's children. The maternal grandmother is the liaison between Mother and Father and Father's paramour. As Mother and Father's paramour do not get along whatsoever, the maternal grandmother's presence has, to some extent, alleviated what would otherwise be a very hostile interaction among these parties.

Mother argues that Father lacks the capacity to be a proper parent. Until CYS stepped in, Father had very little contact with the minor child. In fact, he did not even see the minor child until the minor child was 3 1/2 years old, due to his incarceration. He assumed custody due simply to circumstance, not because he sought custody. Currently, Mother does not believe Father is invested in parenting, although she admits he has a clear love for the minor child. She argues that the parenting of the minor child has been done by Father's paramour, who has inserted herself into the minor child's life and has at-

tempted to assume the role of the mother. Mother believes that the paramour, and possibly Father, taught the minor child to begin calling the paramour "Mommy" and call mother "Jannette." According to Mother, the paramour has made many important decisions regarding the minor child's medical and educational issues, and has refused to provide Mother with information on these issues. Mother believes she is being shut out by the paramour and to some extent by Father.

Mother also points to Father's background. For one, Father has several other children, with whom he has little or no contact, including Josiah. He has an extensive criminal history, including violence, drug abuse and incarceration. He currently drinks beer at an excessive level, including in front of the minor child.

Mother states that Father was abusive to her. On one occasion, he pushed her, causing her to fall down the steps, resulting in her suffering a broken ankle. She is still out of work, on disability as a result of this injury. On the second occasion, Mother alleges that Father "kidnapped" Josiah and withheld him from Mother until Mother would agree to drop a protection from abuse matter and work with him on other issues.

Father seeks to retain primary physical custody. He also presents as a parent who has an extremely strong, compassionate love and bond with the minor child. He and his paramour, who have been together for approximately five years, believe they have provided an excellent home for the minor child, and have straightened out some of the issues the minor child has suffered through Mother's care.

Father believes that the minor child has thrived under his care. He and his paramour have seen to it that she has

obtained proper medical attention. When the minor child first came into Father's custody, it was believed that the minor child had autism. Father followed through with placement at IU-13 but soon learned that the minor child did not have autism. Father and his paramour sought alternative professional help, which resulted in the minor child's current diagnosis and therapy. Father argues that Mother, in contrast, did not attend to the minor child's needs, resulting in her misdiagnosis, as well as her being exposed to harm from Josiah. Additionally, Father testified that when he received the minor child, she was barely able to speak, speaking only six words, was not potty trained, and could not bathe herself.

Father readily admits the problems in his past. He states he was abused as a child. He admits to a list of convictions, which include aggravated assault and drug involvement. However, he states that he has ended his poor behavior and will never go back to it. In addition to reaching middle age, which apparently has softened Father's lifestyle, the factors for Father's change, according to Father, are threefold. First, he received valuable instruction while incarcerated at Graterford, SCI, regarding anger management, parenting, and other important life skills. Secondly, when he got out of state prison, he became committed to never returning to a lifestyle that would result in him returning to prison. He obtained employment and has been working steadily, including overtime hours, to support himself, his children, and to assist his paramour in the household finances.

Third, his capacity to parent grew exponentially after he got to know the minor child. Particularly important was her meeting with him after CYS removed her from Mother's home and he observed her "black eye" and

"scratches." He states that he was empathetic toward her, based on his own experience as an abused child. From that point forward, he has been totally committed to her welfare.

Father states that he wanted to have more contact with the minor child prior to CYS's involvement, but was denied access by Mother. He also states that he wants to become more of a father to Josiah, but can only handle "one issue at a time," and wants to resolve the minor child's status before he moves on to Josiah. Additionally, Josiah's placement is in Pottsville and, logistically, it is difficult to coordinate to get time with Josiah.

Father does admit drinking alcohol, both at home and at a social club he attends. He denies getting intoxicated.

Father also denies Mother's claim of domestic violence against her. Regarding her ankle, Father states that this occurred when she caught her foot on the bottom of a piece of furniture, not from him pushing her or falling down the steps. He states he panicked and immediately called 911, but Mother attempted to get him to stop to enable her to concoct a story where she fell down the steps, in order to obtain insurance for the injury. Father admits picking up Josiah from the daycare on one occasion resulting in him being charged with kidnapping. However, the matter was a simple misunderstanding, and once the district judge learned that Father was the biological father and that he was merely picking up the minor child, the charges were dropped. Father stated that at no time had he abused Mother, although she did attempt to attack him on a few occasions.

Father's paramour, Elisa Vollrath, testified. She stated that she has two grown children and was not looking to

be the caretaker of a young child, but when the situation presented itself, she agreed to accept the responsibility. Her relationship with the minor child has since grown. Ms. Vollrath is an LPN and is the head of her nursing department in an assisted living facility. She is also attending college classes to qualify as an administrator. She appears as an individual who is committed to providing proper care for the minor child. When Father is unavailable due to his work schedule, Ms. Vollrath is quite willing to assist in caretaking duties. She, perhaps even more than Father, has seen to it that the minor child receives proper medical attention for her disabilities. She has been active with the school, although Mother has requested that she desist from being involved, and has also assisted the minor child with her school work.

She acknowledges that the minor child has begun calling her "Mommy." Neither she nor Father encouraged this, but it simply came about. She states that she has attempted to foster a strong relationship between the minor child and her mother, and has no intention of attempting to replace Mother as a parent.

Dr. Torres' report was a strong recommendation in favor of transferring primary custody to Mother. His conclusions stem primarily from issues he has with Father. He outlined Father's background, including his extensive criminal history, involving violence and drug and alcohol abuse. While he has apparently stayed out of trouble of late, has maintained a steady job, and has discontinued his drug abuse, Father continues to drink alcohol on a frequent basis.

Dr. Torres also related his belief that Father is not invested in the care of the minor child. He did not know

the minor child's birth date when questioned. When Dr. Torres observed Father and the minor child together, there was very little interaction. On several occasions, Father was unavailable to appear for interviews due to his work schedule, so the interview was conducted with Father's paramour. In fact, Dr. Torres opines that it is Father's paramour who is invested in the minor child's care, including her educational and special needs, implying that the paramour is the one motivated to retain custody. Dr. Torres also notes Father's background, in which he received little care from either of his parents, and was abused as a child. From this background, Dr. Torres notes that Father had nothing to draw upon to develop parenting skills. Finally, Dr. Torres notes that in addition to the minor child and Josiah, Father is the parent to at least six other children and has little or no relationship with any of them.

Dr. Torres also believes that Father and the paramour have attempted to alienate the minor child from Mother, noting what he calls "bullying tactics" toward Mother and the maternal grandmother, and also points out that the minor child refers to the paramour as "Mommy" and to Mother as "Jannette."

Dr. Torres found no specific problems with Mother. He notes that the minor child was taken from Mother's care for several reasons, all of which have now been remedied. After inspection, Dr. Torres found that Mother's household is now a fit and appropriate physical environment. He notes that she has taken the necessary classes required by CYS. Josiah is not in the household and, in fact, Mother has agreed that Josiah will not be permitted in the residence at any time when the minor child is present.

Dr. Torres also notes a strong bond between the minor child and her older sister, Chantel. When they are in the same household, they are inseparable. Chantel is saddened whenever the minor child has to leave Mother's household.

Dr. Torres recommends that the parties should share legal custody, with Mother to have primary physical custody and Father to have partial custody, but said custody should only occur with the paramour, Ms. Vollrath, present. The maternal grandmother should be available for child care purposes. The minor child should continue to receive therapeutic support, particularly in the area of expressive and emotional domains. There may also need to be intervention to address the parent alienation syndrome, which Dr. Torres found to be present.

Father submitted a report from Pressley Ridge, authored by adoption counselor, Denise Schwebel, and dated November 10, 2008. The report represents a custody home study for the home of Father and his paramour. No such study was performed for Mother's home. The counselor observed that the minor child has a close bond with both Father and his paramour, stating: "Loving and affectionate interactions were observed . . . . [The minor child] understands that Ms. Vollrath is not her mother but does look upon her as a mother figure and calls her 'Mom'. [Father] and Ms. Vollrath explained that it was [the minor child's] idea to call her 'Mom'. There appears to be mutual love and respect between them and they appear to have a mother-daughter relationship." According to the counselor, Father and his paramour also stated that they attempt to foster a strong relationship with the minor child and Mother. The couple also noted Ms.

Vollrath does have a large role in parenting, required by the amount of hours Father has to work.

The counselor also reported that Father and his paramour have adequately addressed the minor child's counseling needs for her psychological and emotional issues.

The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of "all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being." *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

It appears that both parties are considerably better parents now than they were in the minor child's darkest days, when she was being removed from her mother's care and placed with a man she hardly knew. At that time, mother's care of the minor child appears to have been substandard, resulting in CYS's action. While Mother did not directly cause the minor child's injuries, she nevertheless should have known of Josiah's propensities and provided sufficient oversight. The problems with the house itself were not insubstantial, neither were Father's complaints regarding the developmental issues Father observed when he assumed custody. Since then, however, Mother has acquired a much better understanding on how to handle Josiah, through her training. She has taken parenting classes. The house is now suitable for rearing minor children. Mother now appears properly equipped to care for the minor child on a full-time basis.

For his part, Father exhibited no parenting skills whatsoever until he assumed custody of the minor child. At that time, he apparently "woke up" to what is required of a parent. Since that time, he has performed well. He receives extensive assistance from his paramour, who appears to be working in the best interests of the minor child. Accordingly, the minor child has begun to blossom. She is able to function educationally at a normal level. Her personality, by all accounts, appears to be vivacious and engaging.

It would be very easy to be critical of Father for what little he has done for his other children to date. Regarding this minor child, however, he has clearly stepped to the plate. He presents strong support for the belief that people can change.

Dr. Torres was extremely concerned about Father's capacity to parent, in light of his upbringing and criminal background, not to mention Dr. Torres' observation that Father appeared to have little knowledge or investment in the minor child, delegating the parenting to the paramour. We find, however, that Father is not only invested, but preoccupied, with the minor child. He is active with her education and medical issues. He spends substantial quality time with her. He watches children's movies with her. He provides effective atmosphere for household events, such as watching football or with family get-togethers. He understands and assists the minor child in her participation with an age-appropriate computer. He has a thorough understanding of the minor child, her personality, her likes and dislikes, whether it be food, movies, or play. One shortcoming, which he readily admits, is that he has difficulty in disciplining the minor child, a "daddy's little girl" syndrome.

As far as his criminal background, beyond his word that he will never return to this life of crime and his recent positive track record, we have the evidence of his paramour standing by him. As stated, they have been together for approximately five years. She is aware of his past, warts and all. A little less than two years ago she was called upon to assist him in parenting a small child with developmental issues, which was not something she had planned upon. She was willing to accept this undertaking, establishing her strong commitment to Father and his needs. Her commitment has clearly extended to the minor child.

If Father had a propensity or did return to his bad behavior, it is extremely unlikely that Ms. Vollrath would continue to share any existence with him. What she sees is not a man of violence or abuse, but a man who is hardworking and dedicated to his daughter. Given the hole he dug himself with his past, it is notable that he never gave up on himself and it is impressive in what he has been able to accomplish.

That being said, if Father is to be a proper parent to the minor child, he will have to develop into more than a playmate. Although it hurts him to do so, he will have to set appropriate boundaries, to enable the minor child to have proper structure. Father's somewhat cavalier attitude toward alcohol will also have to be addressed, for this can set a poor example for the minor child, particularly since this minor child, with her other issues, should never be led to believe that alcohol abuse is in any way acceptable.

We find that the minor child has been doing well under Father's care. The household is stable. The educational assistance is in place. The minor child's medical needs

are being addressed. Continuity and stability have been established. "[C]ourts are reluctant to disturb existing custody arrangements which have satisfactorily served the best interests of the child." *Wiseman v. Wall,* 718 A.2d 844, 846 (Pa. Super. 1998).

These factors support Father's ability to care for the minor child going forward. Father's history, while a substantial factor which has to be considered, appears to be a thing of the past. "[A] parent's ability to care for a child must be determined as of the time of the custody hearing, not as of an earlier time." *Wiseman, supra* at 847. Additionally, we find Father's version of the facts regarding the alleged domestic violence with Mother and the "kidnapping" incident to be more credible than Mother's.

For her part, Mother has made great strides. There is no reason, assuming Josiah is not present or that his needs have been properly addressed, that Mother cannot function as a primary custodian. In fact, were it not for the distance between the households, and the parties' inability to get along, this court would consider an arrangement of shared custody. We are also cognizant of Mother's other child, Chantel, whose strong relationship with the minor child would be a positive factor in favor of Mother having custody.

Accordingly, Father shall be awarded primary custody during the school year, with Mother to have alternate weekends. Supervised visitations shall no longer be required. During the summer months, Mother will be the primary custodian on weekdays, with the alternate weekends to continue.

It is very important that Mother recognize Father's role as a parent and his paramour's role as a stepparent.

Refusing to deal with the parties, or becoming angry and acting out, are actions which would only serve to hurt the minor child. Mother should be able to move past her hard feelings. For her part, Ms. Vollrath must be very careful to maintain proper boundaries, defining her role as a stepmother and being clear as to Mother's role as a mother, both with the minor child, and in dealing with school and medical agencies. As she will have shared legal custody, Mother will need to be apprised of all matters concerning the minor child and shall have an equal voice in important decisions for the minor child's welfare. Mother should permit Ms. Vollrath to have involvement to facilitate any actions that need to be taken. If these things cannot be accomplished, or if there are difficulties regarding more mundane matters such as the transfer of the minor child from one party to another, further court intervention may be necessary. It is our hope, however, that the parties can all act in a mature fashion and work together for the best interests of this precious young lady.

We enter the following order:

## ORDER

And now, February 4, 2009, after trial held, this court holds that custody of the parties' minor child, Jannellys Fuentes, born July 14, 2003, (minor child), shall be as follows:

(1) The parties shall share legal custody of the minor child.

(2) Defendant, Luis Fuentes-Carrion (Father), shall have primary physical custody of the minor child during the school year, defined as convening from one week

prior to the start of the school year through one week after the conclusion of the school year.

(3) Plaintiff, Jannette Mercado (Mother), shall have primary custody during the summer months.

(4) The parties shall alternate weekends throughout the year, from Friday at 6 p.m. to Sunday at 7 p.m. The party having custody prior to the weekend shall drop the minor child off at the home of the other party, or at some mutually convenient location. When Mother is responsible for transportation, the maternal grandmother shall handle those duties on Mother's behalf.

(5) Mother shall have custody of the minor child on Mother's Day and Father on Father's Day each year from 9 a.m. to 7 p.m.

(6) The parties shall alternate the Christmas holiday, such that on odd-numbered years, Mother shall have December 24 from 1 p.m. to December 25 at 1 p.m., then Father shall have December 25 at 1 p.m. to December 26 at 1 p.m., with the parties to reverse the schedule on even-numbered years.

(7) The parties shall alternate the following named holidays, from 9 a.m. to 7 p.m., with Father having the next holiday after the date of this order: Easter, Memorial Day, July 4th, Labor Day and Thanksgiving.

(8) The holiday schedule shall take precedence over the regular custody schedule.

(9) The minor child, Josiah, shall not be present in a party's home when that party has custody of the minor child. This paragraph is subject to modification by further order of court, if Josiah's issues with violence toward the minor child are properly and comprehensively addressed.

(10) The attached appendix shall be made a part of the within order.

---

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the child:

(A) The right to reasonable telephone contact with the child when he or she is in the other parent's custody.

(B) The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain the necessary information directly from the child's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the child and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the child at any time, any party then having custody of the child shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

(3) Neither party shall alienate nor permit to attempt to alienate the child from the other party. While in the presence of the child, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the child should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the child out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their child.

(6) The parties shall, at all times, consider the children/child's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the child as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the child. By this we mean that the child will not be used as a spy on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their child proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the child to make choices and run the risk of parental displeasure. However, the child shall be consulted as to his or her schedule when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor child.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the child to unnecessary apprehension and failure of expectations.

(D) The party having custody of the child should prepare him or her both physically and mentally for the transfer of custody to the other party and have him or her available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the child.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.